# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CRIMINAL ACTION NO. 3:21-CR-00047-KDB-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| v. | ) **ORDER** |
| DAVID KYLE REEVES, | )<br>) |
| Defendant. | )<br>) |

**THIS MATTER IS BEFORE THE COURT** on Defendant's Motion to Dismiss the Indictment or, in the alternative, order the Defendant be immediately transported to a suitable Bureau of Prisons ("BOP") facility. Doc. No. 51. In response, the United States contends that while the delay in Defendant's hospitalization is regrettable, dismissal is inappropriate. The Court has reviewed the Motion, the parties' briefs and exhibits, and the arguments of counsel at the August 15, 2023, hearing. For the reasons discussed below, the Court will order that if Defendant is not admitted to a suitable facility by September 19, 2023, or the Attorney General has not contracted with a suitable facility to promptly treat and evaluate Defendant as previously ordered, Doc. No. 45, the Indictment is subject to dismissal without further notice.

## I. FACTUAL BACKGROUND

On February 5, 2021, the Defendant was arrested via a sealed complaint issued two days earlier for threatening to kill the President of the United States. *See* Doc. No. 3,7. Twelve days later, a Federal Grand Jury indicted the Defendant on two counts of Interstate Communications with a Threat to Injure in violation of 18 U.S.C. § 875(c); one count of Threats Against the

1

President in violation of 18 U.S.C. § 871; and one count of Influencing a Federal Official by Threat in violation of 18 U.S.C. § 115(a)(1)(B). *See* Doc No. 13.

Shortly after the Indictment, Defense counsel moved for a psychiatric exam to determine the Defendant's competency. Doc. No. 14. On February 23, 2021, Magistrate Judge Keesler ordered a psychological examination under 18 U.S.C. § 4241 to determine the Defendant's competency to stand trial. Doc. No. 15. On September 8, 2021, psychologist Lisa Feldman filed a psychiatric report finding that the Defendant was competent to stand trial. *Id*. A competency hearing was held before Judge Keesler on November 18, 2021, in which the Court found the Defendant competent to stand trial.

Three months later, Defense counsel filed a notice of an insanity defense. Doc. No. 23. The United States filed a motion on April 1, 2022, for a court ordered psychiatric examination of the Defendant seeking an examiner's opinion on the sanity of Defendant at the time of the charged offenses, which was granted. Doc. Nos. 26, 27. A psychiatric report was filed with the Court on September 6, 2022, by Dr. Feldman who found that Defendant was not suffering from insanity at the time of the offense. *Id*.

On November 15, 2022, Defense counsel filed an unopposed motion to declare the Defendant incompetent to stand trial based on the evaluation of Dr. James Hilkey. Doc. No. 38, 45. On January 9, 2023, Judge Keesler held a competency hearing and issued an order under 18 U.S.C. § 4241(d), declaring the Defendant incompetent to stand trial and ordering the Attorney General to take custody of and hospitalize him for treatment. *Id*. Judge Keesler ordered that Defendant "is committed to the custody of the Attorney General… who shall hospitalize the Defendant for treatment in a suitable facility and for further evaluation to determine whether the Defendant can attain, or has attained, competency to proceed." *Id*.

As of at least August 29, 2023, the Defendant is housed at the United States Penitentiary in Atlanta, awaiting transfer to a suitable BOP medical facility for competency restoration treatment. BOP has not committed to a date to move Defendant. Rather, the BOP has only provided the Court with an <u>estimated</u> admission date at FMC Butner for a competency restoration evaluation during the week of October 16, 2023. *See* Doc. No. 52-1. The Defendant has now moved for dismissal arguing that the United States has violated 18 U.S.C. § 4241(d) and the Due Process Clause of the Fifth Amendment. Alternatively, the Defendant asks this Court to order his immediate transfer to a suitable BOP facility for a competency restoration evaluation, or that the United States commence the Civil Commitment process. *See* Doc. No. 51.

## II. DISCUSSION

The Fifth Amendment of the United States Constitution declares no person "shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. This guarantee finds its roots in Article Thirty-Nine of the Magna Carta which proclaimed, "No free man is to be arrested, or imprisoned, or disseised, or outlawed, or exiled, or in any other way ruined, nor will we go against him or send against him, except by the lawful judgment of his peers or by the law of the land." *See* A.E. Dick Howard, *Magna Carta Text and Commentary* 43 (U. Press of Virginia, 1964). Before the Magna Carta, English kings had exercised arbitrary power over their subjects on the theory that a king was above the law. To remedy this abuse, the Magna Carta, and Article Thirty-Nine specifically, prohibited any arbitrary action by the king against certain protected interests.

At the time of the drafting of the Bill of Rights, eight state constitutions contained provisions restraining government from depriving persons of life, liberty, or property except under the law of the land *See* Forte, David; Meese, Edwin III; and Spalding, Matthew, *The Heritage*

3

*Guide to the Constitution* (2014). The Fifth Amendment follows the form of these provisions except for the substitution of "due process of law" for "law of the land." *Id*. The phrase "due process of law," in usage since 1354, originally meant that judgments could be issued only when a defendant had a chance to appear in court under an appropriate writ but came to be used synonymously with "law of the land." *Id*. The conflation of these terms is likely the result of the drafters' belief that the terms were equivalent. *Id*. It has therefore become a common understanding that the drafters of the Fifth Amendment were referring to the broader principle of legality, as enunciated in the Magna Carta, rather than mere pleading technicalities.

When the Fifth Amendment was ratified, the meaning of "liberty" was well-known. Liberty meant the "power of locomotion, the changing of situation, or removing one's person to whatsoever place one's inclination may direct; without imprisonment or restraint." Sir William Blackstone, *Commentaries on the Laws of England* (1765-1769). While this narrow definition may not include many of the "liberties" that have come to be found in the many cases interpreting this provision (and the analogous provision in the Fourteenth Amendment), it plainly encompasses incarceration. In short, the original meaning of the Fifth Amendment's Due Process Clause prohibits the Federal Government from taking one's freedom of movement without prior legal authorization and without following the required judicial procedures.

This bulwark against indefinite and arbitrary detention consequently constrains the United States' ability to restore a person's competency to stand trial. *United States v. Tucker*, 60 F.4th 879, 883 (4th Cir. 2023); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). In *Jackson v. Indiana*, 406 U.S. 715, 720 (1972), the Supreme Court held that the

4

Fourteenth Amendment's Due Process Clause[1] prohibits a State from confining a defendant for an indefinite period simply because he is not competent to stand trial.. That case involved a defendant who was committed to Indiana's Department of Mental Health "until such time as that Department should certify . . . that the defendant is sane," despite his attorney's representation that restoration was improbable. *Id*. at 719 (internal quotation marks omitted). By the time the case reached the Supreme Court, Jackson had been confined for three-and-a-half years without any indication that he could be restored to competency. *Id*. at 738-39. The Court concluded that this indefinite confinement violated the defendant's due process rights, holding: "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id*. at 738. Therefore, a person committed "solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id*.

In the wake of *Jackson* and the acquittal of John Hinckley Jr. for his attempted assassination of President Ronald Reagan, Congress enacted the Insanity Defense Reform Act ("IDRA") to overhaul the provisions governing pretrial competency determinations. *See United States v. Donnelly*, 41 F.4th 1102, 1105 (9th Cir. 2022); *United States v. Lara*, 2023 U.S. Dist. LEXIS 74172 (D.N.M. May 5, 2023). Under IDRA, after a defendant is found incompetent, a district court commits the defendant to the custody of the Attorney General; and the Attorney General hospitalizes the defendant for treatment in a suitable facility for such a reasonable time, not to exceed four months, to determine whether he can be restored to competency and if so, for a further

---

[1] While *Jackson* interprets the Fourteenth Amendment's Due Process Clause, its analysis is applicable to the Fifth Amendment's Due Process Clause. *See Tucker*, 60 F.4th at 884 (applying *Jackson* in the context of the Fifth Amendment)

5

Case 3:21-cr-00047-KDB-DCK   Document 60   Filed 09/05/23   Page 5 of 10

period to attempt to restore competency. 18 U.S.C. § 4241(d) and (d)(1). The text of this statute makes clear that the four-month limitation applies only to the period of hospitalization, and therefore begins to run when the defendant has been hospitalized. *Donnelly*, 41 F.4th at 1105; *United States v. Curbow*, 16 F.4th 92, 122 (4th Cir. 2021) (Traxler, J., concurring); *United States v. Magassouba*, 544 F.3d 387, 408 (2d Cir. 2008) ("[W]e construe § 4241(d)(1) to impose a four-month limit only on the Attorney General's authority to hold an incompetent defendant in custodial hospitalization for the purpose of determining the probability of his regaining competency."); *United States v. Villegas*, 589 F. App'x 372, 373 (9th Cir. 2015) (unpublished) ("The plain language of § 4241(d) provides that the four-month period of evaluative commitment begins on the date of hospitalization. . . [t]he statutory period was therefore triggered when [the defendant] arrived at FMC Springfield[.]").

But what about pre-hospitalization delays like the one here? The statute does not address that. Yet, at some point a lengthy pre-hospitalization delay clearly raises due process concerns. Without offering a number of months that would trigger a due process violation, the United States conceded at argument on this Motion that at some point a defendant's pre-hospitalization detention would violate the due process clause. And *Jackson* teaches that the delay cannot be indefinite and must be rationally related to the purpose for which the individual is committed. *Jackson*, 406 U.S. 715 at 738. Here, the Defendant's lengthy and ongoing detention fails that test and therefore violates the Fifth Amendment's guarantee of due process of law.

*Jackson*'s "reasonable relation" requirement simply cannot be squared with a pre-hospitalization delay of at least nine months, the <u>estimated</u> time before Defendant will be

hospitalized.[2] This constitutional requirement does not permit a pre-hospitalization detention period, whose only purpose is to place the defendant at a suitable facility for treatment, to last over twice as long as the maximum time Congress permitted for the entire length of his hospitalization. In fact, if the Court were to permit the Defendant to languish in pre-hospitalization detention until his expected placement date, he will have already been incarcerated pretrial longer than the expected United States Sentencing Guidelines range for his offense.[3] At this point, Defendant is not detained awaiting a speedy trial, but only for the purpose of hospitalization pursuant to a separate statute. Simply put, this lengthy pre-hospitalization detention has no reasonable relation to the purpose for which the Defendant is committed.

The United States attempts to evade this conclusion by arguing that the Bureau of Prisons' resources are strained. This explanation cannot be accepted to excuse a due process violation. The United States represents that "the shortage of qualified forensic psychologists to staff the psychiatric referral centers, the increased number of competency restoration orders issued by courts, as well as bed space limitations at the psychiatric referral centers" are the reason that the wait time for a defendant's transfer to a suitable facility has increased from two to three months to ten to twelve months over the last few years. *See* Doc. Nos. 51, 52. All of that may be true, but this problem is entirely of the Attorney General's own making. These administrative and bureaucratic deficiencies did not just sneak up on the Attorney General; they have been years in the making and reasonably foreseeable. Also, the Attorney General has the authority to contract with a State, a political subdivision, a locality, or a private agency for the hospitalization of a person committed

---

[2] This analysis would change significantly for a defendant out on bond. Here, the Defendant consented to detention and, in any event, appears ineligible for release due to the risk he poses to himself and others along with his lack of a stable housing situation. *See* Doc. No. 9.
[3] At the hearing counsel for the government and Defendant estimated that Defendant's likely sentencing guidelines range would be 24 – 30 months.

7

to his custody under the IDRA. *See* 18 U.S.C. § 4247(i)(A). Yet to this Court's knowledge, and to the parties', the Attorney General has not contracted with any such facility to alleviate the backlog of defendants needing treatment. While the choice to contract with any such facility is the Attorney General's alone, he cannot get a pass for violating a defendant's rights while choosing to disregard a congressionally authorized solution.

Turning to potential remedies, the Defendant suggests three: (1) dismissal; (2) civil commitment; and (3) immediate placement in a suitable facility. Dismissal is an extraordinary remedy, which the Court does not consider lightly, but is appropriate when "grossly shocking and outrageous" misconduct occurs. *See United States. v. McCall*, 2022 WL 19561433 (N.D. Ga. Dec. 12, 2022); *see, e.g.*, *United States v. Cottingham*, 2020 WL 4341720, at *1-2, 4 (N.D. Ala. July 6, 2020), *report and recommendation adopted*, 2020 WL 4336018 (N.D. Ala. July 28, 2020) (finding dismissal of indictment was inappropriate where defendant was in custody for about six months waiting on bed space for a § 4241(d) evaluation); *see also United States v. Wills*, No. 18- CR- 00289, 2020 WL 53850, at *4 (S.D.W. Va. Jan. 3, 2020). Indeed, the *Jackson* Court did not order dismissal even though the defendant had been committed for more than three years. *Jackson*, 406 U.S. at 738. Practically speaking, dismissal may achieve nothing more than sending this matter back to square one if the Defendant is re-indicted.

Civil commitment under 18 U.S.C. §§ 4246 and 4248 is inapt. The Defendant is not subject to those provisions until the end of his hospitalization period and a determination that his condition has not sufficiently improved to proceed. *See* U.S.C. § 4241(d). This matter has therefore not yet reached the civil commitment stage.

As for immediate placement, the United States contends that it would be "counterproductive" for the Court to order the Defendant to be hospitalized before his estimated

8

Case 3:21-cr-00047-KDB-DCK   Document 60   Filed 09/05/23   Page 8 of 10

placement date. The United States correctly argues that this would "necessitate [the Defendant] cutting in front of other defendant/patients ahead of him in BOP's current line… [,] amounts to nothing more than an ad hoc reshuffling of the waiting list for entrance into BOP hospitals… [, and] would create an absurd and unfair result." *See* Doc. No. 52. Yet, this "absurd result" is already taking place. While placement is typically first-come, first-served, the Ninth Circuit's ruling in *Donnelly* has caused the Bureau of Prisons to earmark beds for Ninth Circuit defendants at the expense of all other defendants.[4] *See United States v. Rendon-Romero*, 5:21-CR-436 (E.D. N.C.), Doc. No. 52-1 p. 3 ¶ 11. Therefore, it seems that the Ninth Circuit's stick is more effective than the carrot of admonishing yet deferential courts. So, the stick it must be.[5]

To assuage the Court's concerns, the United States offers to provide it with status reports on the Defendant and his projected hospitalization date until he is placed in a suitable facility. Status reports informing the Court that the Attorney General continues to violate the Defendant's due process rights is no cure of the violation. Would the Constitution tolerate status reports on cruel and unusual punishment, unreasonable searches and seizures, or the quartering of troops in homes as remedies for those abuses? The Court thinks not. And accordingly, such a "remedy" is rejected.

Nor will the Court order the Bureau of Prisons to immediately hospitalize Defendant, as he requests. Such an Order would arbitrarily leapfrog Defendant over other defendants, extending the due process violations of those defendants.

---

[4] At the hearing counsel for Defendant represented this Bureau of Prisons policy to be in place, and the United States did not dispute this representation.

[5] Astonishingly, the United States represented that the Bureau of Prisons simply would not follow an Order of the Court to admit Defendant but would instead follow its own policies. The Court will resist the temptation to immediately test that statement and hold the appropriate individual in contempt of court if such an Order is disregarded. *See* 18 U.S.C. § 401(3))

9

In sum, the Attorney General asserts that even if the Court believes that Defendant's due process rights are being violated (which it does) there is nothing the Court can (the Bureau of Prisons will ignore a Court Order of immediate hospitalization) or should (dismissal of the indictment is inappropriate) do. This can't be true. It isn't true.

The Attorney General must hospitalize a defendant after he is found incompetent within a reasonable period of time. Whatever the ultimate bounds of the Constitutionally permissible period of pre-hospitalization commitment to allow the Attorney General to place the defendant at a suitable facility may be, in this case a delay of nine-months is impermissible and violates the Defendant's due process rights. If the Attorney General does not remedy Defendant's due process violation the Court will.

**IT THEREFORE ORDERED THAT** Defendant's Motion to Dismiss the Indictment or, in the alternative, order the Defendant be immediately transported to a suitable Bureau of Prisons facility, Doc. No. 51, is **DENIED without prejudice**. The United States is **ORDERED** to report to the Court by September 19, 2023, whether the Defendant has been admitted to a suitable facility or that the Attorney General has contracted with a suitable facility to treat Defendant as ordered on January 9, 2023. Absent a showing that Defendant's due process rights are no longer being violated, the Indictment is subject to dismissal without further notice.

**SO ORDERED**.

Signed: September 5, 2023

Kenneth D. Bell
United States District Judge